IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No.   16-cv-02036-RBJ-NYW

ELIZABETH B., a minor, by and through her parents and next friends, DONALD B. and
AILEEN B.,

      Plaintiff,

v.

EL PASO COUNTY SCHOOL DISTRICT 11,

      Defendant.

---

## ORDER

---

      Donald B. ("Mr. B.") and Aileen B. ("Ms. B."), are the parents of Elizabeth B. ("Lizzie").
Lizzie was six years old at the time of the hearing, and has multiple medical diagnoses including
epilepsy, significant seizure activity and autism spectrum disorder.  In January 2016 Parents
placed Lizzie at the Alpine Autism Center ("Alpine"), a nonprofit organization specializing in
the care and education of individuals with autism. R. 654.[1]  In this action, Parents seek
reimbursement for the costs of Lizzie's placement at Alpine, claiming that El Paso County
School District 11 (the "District") failed to develop an individualized education plan ("IEP") for
the 2015–2016 school year that would provide their daughter with a free and appropriate public
education ("FAPE") as required by the Individuals with Disabilities in Education Act ("IDEA").

      Parents received a due process hearing as required by the IDEA before Administrative
Law Judge Keith Kirchubel of the Colorado Office of Administrative Courts ("ALJ"). The ALJ

---

[1] Citations to the Record using the shorthand "R." refer to the Record of the Colorado Office of
Administrative Courts Case No. EA 2015-0033 filed with the clerk's office at ECF No. 23.

found that the District was providing Lizzie with a FAPE, and that Parents' alternative private placement did not provide Lizzie with an education in the least restrictive environment as required by statute. R. 1462. The parties agree that the Parents' appeal can be resolved based on the evidence in the administrative record and the briefing. *See* ECF No. 20, ¶ 11(b). The briefing in this case includes the Parents' opening brief, the District's response brief, Parent's reply brief, District's sur-reply brief, Parents' sur-sur reply brief, and several filings on supplemental authorities. ECF Nos. 33, 38, 41, 46, 47–52. After a careful review of the administrative record and the parties' arguments, the ALJ's decision is AFFIRMED.

## I.     BACKGROUND

In a review of an administrative decision under the IDEA, the district court considers the ALJ's findings of fact to be *prima facie* correct. *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). After reviewing the administrative record, especially the transcript of the administrative hearing, I find no reason to disagree with any of the factual findings outlined by the ALJ at R. 1442–56. I incorporate these factual findings fully and will summarize key points here.

Lizzie is a child that experiences significant seizure activity, epilepsy and autism spectrum disorder. She has undergone numerous brain surgeries, including one surgery to place 126 electrodes on the surface of her brain to track her seizures which unfortunately involved major post-surgical complications. R. 2503, 2580–82, 2586. Lizzie experiences seizures of different types, some that are obvious to the untrained eye and others termed "absence seizures," which are more difficult to detect and marked by her eyes becoming fixed or rolling back. R. 1442. Lizzie also experiences language delays, impaired impulse control marked by attempts to "elope" or run away without notice, and trouble with fine motor activity, requiring assistance

with things like dressing and bathing.  R. 1442.  All parties agree that Lizzie is a child with a disability in need of special education services.  R. 1442

Lizzie was born in New York, where she was enrolled in a preschool program receiving special education services featuring a one-on-one instructional aide qualified in Applied Behavior Analysis ("ABA") methodology.  R. 2529.  ABA methodology is a well-regarded form of treatment for children with autism that focuses on teaching behaviors using "operant conditioning," or teaching using a stimulus, a response and a reinforcement.  *See* R. 2466–67, 2589.  A Board Certified Behavior Analysist ("BCBA") is a professional who has received a master's degree and undergone additional training to become a behavior analyst.  R. 2601.  A BCaBA is a behavior analysist one step below a BCBA at the bachelor's level of certification.  R. 2602, 2683.

In New York, Lizzie was in a classroom of six children with autism and was integrated with up to twelve children at recess or break times, some of whom were neurotypical.  R. 2530.  The family moved to Colorado from New York in January 2014 so that Lizzie could access alternative therapy options.  R. 1443.  Once in Colorado, Lizzie attended preschool at Scott Elementary School for the 2013–2014 school year.  R. 2530–31.  The family moved within Colorado, and Lizzie attended preschool for the 2014–2015 school year at Madison Elementary School.  R. 2530.  In both schools she was placed in an integrated class of sixteen students with one teacher and two aides for the room.  R. 2530.

In the fall 2014 Lizzie began experiencing complications from the electrode surgery which necessitated another surgery in October 2014.  This resulted in her absence from the entire second quarter of the school year.  R. 2586.  Beginning in March 2015 Lizzie attended Alpine for half-days in the morning under a Medicaid program waiver.  R. 2949, 3128.  In this program she

worked on language acquisition and behaviors using ABA methodology in a highly structured learning environment. R. 1443. A BCaBA therapist that worked with Lizzie at Alpine, Cara Krzemien, testified that this structured environment helped Lizzie manage harmful behaviors such as noncompliance, self-injurious behaviors, "chinning," which involves applying pressure with her chin to objects, and self-stimulating behaviors or "stimming". R. 2707. Self-stimulating behaviors are repetitive actions such as creating and then re-creating piles of objects that can result from her desire to avoid a task. R. 1442. Although Lizzie engages in these behaviors when left alone, providers are able to interrupt such behaviors and redirect Lizzie back onto task. R. 2709.

Parents voiced concerns over Lizzie's placement in a regular education classroom without a one-on-one aid, and in July 2015 the parties reached a written settlement resolving issues with the Student's preschool enrollment. Because this settlement included a release of all claims arising prior to July 31, 2015, the scope of issues in the hearing before the ALJ were limited to events after July 2015. R. 1443. The settlement agreement provided that Lizzie would spend each afternoon at the District's Teacher Training Lab at Twain Elementary School ("Lab") for the first quarter of the 2015-2016 school year. The Lab is a training facility where District staff learn ABA principles from a qualified instructor while the curriculum is being delivered to students. R. 2611–15. One goal of the Lab is to provide intensive instruction for and assessments of a child to develop a program that can be implemented when the child returns to her neighborhood school. A concurrent goal is to improve the ability of District staff to serve the needs of students with autism in the neighborhood school. R. 2612. Typically a child will complete a quarter at the Lab, then return to a continuum room in her neighborhood school that duplicates what was done in the Lab with the supervision of a BCBA assigned to that school. *Id.*

Lizzie attended the Lab beginning in fall 2015 for half-days. Lizzie continued to attend Alpine thereafter in the mornings (though this was not provided for in the IEP or funded by the District) and attended the Lab in the afternoon. R. 2492, 3128. The Lab provided one adult to one student support, and often two-to-one support, for Lizzie. R. 2923. In the program she worked with an educational assistant-in-training, a special education teacher, and at times an occupational, physical or speech-language therapist. R. 2612–18, 1443. Because the Lab is not intended to be a permanent placement for students, the parties planned follow-up IEP meetings to determine Lizzie's placement after the first quarter. R. 1896.

The District and Parents had a follow-up IEP meeting on August 17, 2015. R. 1896. The August 2015 IEP specified that Lizzie would return to a regular early childhood program for at least 10 hours per week and receive the majority of special education and related services in some other location, which District staff indicated would be a "continuum classroom." R. 1907, 2618, 2628. The August 2015 IEP also set the next IEP meeting to occur on or before October 19, 2015 so that the parties could resolve Lizzie's placement for remainder of the 2015–2016 school year. Before the October 2015 IEP could take place, however, the special educator who had been working with Lizzie at the Lab resigned. R. 3002. The District offered to extend Lizzie's stay in the Lab for another quarter so that a replacement teacher could train with her, but the educator's resignation meant that Lizzie would have to attend Madison Elementary for a period of eight days. R. 2112–13, 2540. After an unsuccessful meeting with the District to address alternative options, the Parents filed a due process complaint on October 7, 2015. R. 1938. On October 19, 2015 the parties signed a partial settlement agreement to resolve the due process complaint. R. 1940. The partial settlement agreement mandated that Lizzie attend the Lab through December 18, 2015 with a new special educator-in-training. *Id.*

On December 3, 2015 Parents filed a notice of intent to unilaterally place Lizzie at Alpine full-time starting January 4, 2016. R. 654. The notice also indicated that Parents would seek reimbursement from the District for private placement of Lizzie. On December 14, 2015 another IEP meeting was held. This was attended by Parents, their advocate Crystal Morgan, an attorney for the District, Alpine staff Sandra Ruvulcaba and Cara Krzemien, and a number of District employees, many of whom worked directly with Lizzie: a special education facilitator, a school psychologist, a speech language pathologist and teacher at the Lab, an assistive technology coordinator, an occupational therapist, a physical therapist, a BCBA behavior consultant, a school nurse, a speech language pathologist at Madison, and the Madison principal. R. 1917. The IEP team considered the reports of Dr. Edmundson, who treated Lizzie and administered a Vineland-III assessment, Dr. Rachel Toplis, who conducted the independent psychological assessment, and Lizzie's private physical and occupational therapists.

The December 2015 IEP that emerged from this meeting specified that

> Elizabeth will be provided constant adult supervision for safety, personal care, communication, eating, and redirection across all school settings. Elizabeth will receive direct Special Education services to work on pre-academic skills. Services will include strategies and techniques consistent with those demonstrated at the Twain Training Lab including, but not limited to consistent reinforcement, first/then strategies, visual prompts, and errorless teaching strategies. Direct and Indirect school-based occupational therapy services for fine motor skills related manipulation of classroom tools and materials. Indirect [physical therapy] consultation. Consistent access to assistive technology. Direct and indirect speech language services in a small group or one on one setting.

R. 1927. It provided for Lizzie to have at least fifteen hours of special education services per week, four hours with a speech language pathologist per month, a half hour of physical therapy per month, a half hour of occupational therapy per month, and less than forty percent of her time in the general education classroom. R. 1927. It did not provide for extended school year services. At this meeting, Parents requested a one-on-one educational assistant for Lizzie. They

also advocated for an increase in time for occupational therapy, physical therapy, speech therapy and special education services. They wanted the inclusion of extended school year services and for ABA methodology to be listed specifically on the IEP. R. 1936, 2972. In the alternative, they requested placement at Alpine, where Parents felt that Lizzie was benefitting from the one-on-one instruction and ABA methodology. R. 1936, 2965, 2970.

Unhappy with the December 2015 IEP, Parents filed an amended due process complaint in late December 2015. Lizzie began attending Alpine full-time in January 2016.

The ALJ summarized the disputed issues for the hearing as follows:

1. Whether the District committed procedural violations in developing an IEP during August and December, 2015, IEP team meetings by precluding meaningful input from student's parents and/or by predetermining her educational program and placement, including the areas of adaptive physical education and extended school year services, prior to the IEP process;

2. Whether the District failed to appropriately measure the student's progress in the areas of behaviors and cognition in implementing the August, 2015 IEP;

3. Whether the student has received a free appropriate public education ("FAPE") as evidenced by her substantive progress on goals and objectives present in the August, 2015 IEP; and

4. Whether the District is unable to provide the student with a FAPE going forward such that the District is responsible for reimbursement of tuition and other direct expenses of private school.

R. 1441. After a four-day evidentiary hearing, the ALJ found that the Parents had a meaningful opportunity to participate in the IEP process during the August and December meetings; that the District's inability to measure Lizzie's behavior and cognition did not constitute a procedural violation or a failure to provide her with a FAPE; that Lizzie was making substantive progress on the goals set forth in the August IEP; and that the December IEP afforded Lizzie a FAPE such that the Parents were not entitled to reimbursement for the costs of Alpine. The ALJ concluded that the December IEP was "reasonably calculated to confer some educational benefit on the

Student given the unique needs associated with her disabilities," and that placement at Alpine

"did not conform to the requirement of special education being provided in the least restrictive

environment appropriate to the Student's needs."  R. 1462.  The Parents seek review and reversal

of the ALJ's decision.  ECF No. 1, ¶ 19 (citing 20 U.S.C. § 1415(i)(2)(A)).

## II.    STANDARD OF REVIEW

### A.  The Individuals with Disabilities in Education Act (IDEA)

One of the primary purposes of the IDEA is "to ensure that all children with disabilities

have available to them a free appropriate public education that emphasizes special education and

related services designed to meet their unique needs and prepare them for further education,

employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  States receiving federal

funding for education must provide a "free appropriate public education," or FAPE, to all

children with disabilities residing in the state.  20 U.S.C. § 1412(a)(1).  A "FAPE comprises

'special education and related services'—both 'instruction' tailored to meet a child's 'unique

needs' and sufficient 'supportive services' to permit the child to benefit from that instruction."

*Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748–49 (2017) (quoting 20 U.S.C. §§ 1401(9),

(26), (29)).

The primary mechanism for delivering a FAPE to a child is the "individualized education

program," or IEP.  20 U.S.C. § 1401(14).  "The IEP is a written statement that sets forth the

child's present performance level, goals and objectives, specific services that will enable the

child to meet those goals, and evaluation criteria and procedures to determine whether the child

has met the goals."  *Ass'n for Cmty. Living in Colorado v. Romer*, 992 F.2d 1040, 1043 (10th Cir.

1993).  A child's IEP is crafted by his or her "IEP team" - a group of school officials, teachers,

and parents.  *Fry*, 137 S. Ct. at 749.  IEPs must be reviewed at least annually and revised as

appropriate.  20 U.S.C. § 1414(d)(4).

A FAPE has two components.  First, the State must comply with the procedures set forth in the IDEA.  "These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1* (*Endrew F.*), 137 S. Ct. 988, 994 (2017) (citing 20 U.S.C. § 1414).  Second, the State must meet its substantive obligation under the IDEA by offering "an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.  For a child fully integrated in the regular classroom, an IEP should be "'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id.* (quoting *Rowley*, 458 U.S. at 203–04).  For a child not fully integrated in the regular classroom, an IEP "must be appropriately ambitious in light of [her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id.* at 1000.  Although these are "general standard[s], not a formula," *id.*, the IDEA contemplates that an appropriate education will demand a "fact-intensive exercise . . . informed not only by the expertise of school officials, but also by the input of the child's parents or guardians," *id.* at 999.  However, the goal of a court reviewing an IEP is to determine whether it is reasonable, not whether it is ideal.  *Id.* at 999–1000.

If a child's parents and school cannot agree on an IEP, the IDEA establishes formal procedures for resolving the disagreement.  *See* 20 U.S.C. § 1415.  Parents may file a due process complaint with their local educational agency to challenge the school district's provision of a FAPE based on a procedural or substantive violation of the IDEA.  *Id.* § 1415(b)(6).  If the parties' disagreement continues after a meeting or mediation, the educational agency conducts a due process hearing before an impartial hearing officer who receives evidence and determines

whether the child has received a FAPE. *Id.* § 1415(f)(3). Parents who remain dissatisfied with the outcome of the hearing may appeal the decision further by filing a complaint in state or federal court. *Id.* § 1415(i)(2)(A). Parents are entitled to reimbursement for a private educational placement under the IDEA if it is determined that: 1) the IEP calling for placement in a public school is not appropriate and 2) the private placement is appropriate. *School Comm. Of Burlington v. Dept. of Educ.*, 471 U.S. 359, 370 (1985).

## B.  De Novo Review

"The IDEA sets up a unique standard for a federal court's review of the administrative due process hearing." *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 973 (10th Cir. 2004) (citing 20 U.S.C. § 1415(i)(2)). IDEA requires the district court to engage in a "modified *de novo* review," independently reviewing the evidence in the administrative record and reaching a decision by a preponderance of the evidence. *Murray v. Montrose Cty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995). Though the review is *de novo*, the Supreme Court has held that a district court must give "due weight" to the administrative proceedings and consider factual findings to be "*prima facie* correct." *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008) (citing *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982)).

## C.  Substantive Requirements

The parties dispute the consequences of the Supreme Court's decision in *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1* (*Endrew F.*), 137 S.Ct. 988 (2017), a decision published after the hearing and the ALJ's decision. *Endrew F.* announced a more demanding standard than the *de minimis* standard used in this Circuit previously for determining whether a student is receiving a FAPE. In his decision, the ALJ relied upon a standard gleaned from *Rowley*, 458 U.S. at 200 (1982). In doing so, the ALJ stated that a FAPE "generates no

additional requirement that the services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children; the school district's obligation extends only so far as to provide a basic floor of educational opportunity consisting of specialized instruction and related services that are individually designed to accord some educational benefit." R. 1457. Since the ALJ's decision, the Supreme Court has reversed the Tenth Circuit's *de minimus* formulation articulated in *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 798 F.3d 1329, 2338 (10th Cir. 2015) as inconsistent with *Rowley*. The Court has clarified that *Rowley* did not establish the substantive standard for FAPE, and it rejected the notion that *Rowley* created a "some educational benefit" standard. *Endrew F.*, 137 S. Ct at 1000.

Instead, it held that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* An Individualized Education Program (IEP) for the child "must be appropriately ambitious in light of [her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.*

The parties do not dispute that the Supreme Court's decision in *Endrew F.* has retroactive application. *See, e.g., Niz Robles v. Lynch*, 803 F.3d 1165, 1170–71 (10th Cir. 2015). Accordingly, I must apply the FAPE standard under *Endrew F.* in determining whether the District has met its obligations under IDEA. Parents contend that the ALJ's decision should be reversed because he relied upon the wrong standard. ECF No. 41 at 6. However, I disagree that this alone requires reversal. I owe no deference to the ALJ's findings of law. I review the ALJ's factual findings essentially *de novo*, and the parties agree that this matter can be resolved through

the evidence already contained in the administrative record.  *See* ECF No. 20, ¶ 11(b).

Therefore, I can apply the *Endrew F.* standard to the evidence in the administrative record to

determine whether Lizzie's IEP provides her a FAPE under current law.  *See, e.g., Matthews v.*

*Douglas Cty. Sch. Dist. RE 1*, 2018 WL 4790715, at *5 n.8 (D. Colo. Oct. 4, 2018) (doing the

same).

### III.    ANALYSIS

The Parents raise four arguments on appeal: (A) the ALJ's decision that the December

2015 IEP is reasonably calculated to provide Lizzie with a FAPE is not supported by a

preponderance of the evidence; (B) Alpine is the least restrictive educational environment

appropriate for Lizzie; (C) the District predetermined Lizzie's placement at Madison prior to the

December 2015 IEP meeting; and (D) the Parents are entitled to be reimbursed for the costs of

placing Lizzie at Alpine.  *See* ECF No. 33 at 11–24.  I will address each in turn.

### A.  The December 2015 IEP

The ALJ found that the December 2015 IEP was reasonably calculated to guarantee some

educational benefit to Lizzie.  With the benefit of the Supreme Court's definition of FAPE in

*Endrew F.*, I must determine whether this IEP was reasonably calculated to enable Lizzie to

make progress appropriate in light of her circumstances. The Parents argue that the IEP falls

short in four ways.  It does not: (1) indicate that Lizzie will receive one-on-one instruction; (2)

indicate that Lizzie will receive ABA instruction; (3) require the District to perform a functional

behavioral assessment or behavior intervention plan; or (4) provide for extended school year

services.  The District counters that the record demonstrates that the IEP is nonetheless expected

to enable Lizzie to make significant progress.

The District highlights the testimony of a number of providers that have worked with

Lizzie. First, it points to the testimony of Joan Olds, a speech language pathologist and BCBA who worked with Lizzie for two quarters at the Teacher Training Lab Program. R. 2533, 3253. She testified about the many children with autism with whom she has worked and their successes in taking the skills they learned in the Lab and building on them in their neighborhood schools. R. 3250. She also testified that compared to other students with autism or related disorders she has worked with at the Lab, Lizzie was one of her top performers in terms of her motivation to learn and her minimal negative behaviors. R. 3254. In her time at the Lab, Lizzie made progress on her educational goals and social skills. R. 3255. Although Lizzie eloped (attempted to leave the classroom) on two occasions, neither situation posed a safety risk to Lizzie. R. 3261–62. The providers who treated Lizzie at the Lab acknowledged that because Lizzie was attending Alpine for a half-day concurrently, it is difficult to attribute which of Lizzie's successes came from the Lab and which from Alpine. Nonetheless, based on her work with Lizzie and her experience educating children with autism who have transitioned from the Lab to their neighborhood schools, Ms. Olds expected Lizzie to make significant progress on the objectives in the December IEP upon returning to Madison. R. 3281–82. Moreover, she did not think that Lizzie's behavioral issues would impede her from progressing. *Id*.

However, Ms. Olds qualified this opinion, stating that Lizzie should begin in a continuum room and then transition to general education where she could have help from the assistant teacher in the classroom on individualized tasks. R. 3283. I find that Lizzie's IEP provides for such an accommodation. The IEP states that Lizzie will spend less than forty percent of her time in a general education classroom, leaving open the possibility that she could spend more time in the continuum classroom to begin. Testimony from Dr. Colleen Cornwall, an expert in ABA therapy who helped develop the Lab, established that the ratio of time in general versus special

education can be adjusted for Lizzie's benefit, and that in her experience, these ratios are often adjusted as students transition from the Lab to their neighborhood schools. R. 2654 – 56. Dr. Nancy Homan, the lead special education facilitator in District 11, testified that subtracting out non-instructional time from the school week and taking into account the hours of special services, Lizzie's IEP provides that at most she would be in a general education classroom for 11.09 hours, or 31.6 percent of the school week. R. 3143. She clarified that this provides a ceiling, and that Lizzie would probably be in general education for less time than that to begin. R. 3142. She testified that if Lizzie does not react well to the general education classroom, that the school could place her in special education for the entirety of her time. On the other hand, if Lizzie demonstrates that she is amenable to greater integration with neurotypical peers, she can spend more time in the general classroom. R. 3145. Dr. Homan testified that IEPs typically provide a range of time to spend in regular versus special education instruction so that the school can adjust the student's schedule based on the student's reaction to each environment. *Id.*

Chad DeKam, a special education instructor who supports teachers from the Lab once they return to their neighborhood schools, also testified about Lizzie's transition from the Lab to Madison under the IEP. R. 3332. Mr. DeKam testified that in his experience, students that spend a quarter in the Lab generally succeed upon returning to their home school setting. R. 3334. He described Lizzie's behaviors at the Lab as milder than other students. Because Lizzie is easily redirected back to task, he did not believe that her negative behaviors would prevent her from making significant progress under her IEP back at Madison. R. 3338, 3343. The testimonies of these providers support a conclusion that on the whole, the District's IEP was reasonably calculated to enable Lizzie to make progress appropriate for her circumstances. Nonetheless, I will address each of the perceived shortcomings in the IEP in turn.

1.  <u>One-on-One and ABA Instruction.</u>

The Parents first argue that the December 2015 IEP does not provide Lizzie with a FAPE because the IEP did not specifically indicate that she would receive one-on-one instruction or that special education services would be provided using ABA principles. ECF No. 33 at 13-16. Mr. B. testified that a one-on-one aide was important for Lizzie's safety in an educational setting. He had concerns about Lizzie's seizures and her tendencies to elope. He believed it was necessary to have a staff member present to provide immediate attention should Lizzie have a seizure or try to run away. R. 2904, 2907. He was also concerned that without an aide available to redirect Lizzie back onto task, she would engage in self-stimulating behaviors and disengage from educational activities by piling objects, chinning or pinching herself. R. 2907. It was also important to him that Lizzie's teachers have been trained in ABA methodology, and they provide instruction using these methods. R. 2913. However, after reviewing the record, I agree with the ALJ that although the IEP did not mention these things specifically, it does commit the District to these principles using other terms.

The December 2015 IEP specifies that "Elizabeth will be provided constant adult supervision for safety, personal care, communication, eating, and redirection across all school settings." R. 1927. Dr. Cornwall testified that in the continuum classroom, Lizzie's activities would be one-on-one with an instructor or one-on-two where Lizzie would be practicing taking turns responding to instruction with a child next to her. R. 2655–56. Dr. Homan testified that Lizzie will also have adult supervision during noninstructional time including lunch, recess and bathroom breaks. R. 3143–44. Dr. Jeralynn Olvey, the executive director of special education in District 11, explained that the District has moved away from using the term "one-on-one" and away from the practice of tying a child to one assistant so as to prevent dependency on a specific

adult. 3383–84. Instead the District provides support through several different professionals. With an IEP specifying "constant adult supervision" for a student, the District would provide that support through a teacher, therapist, classroom assistant or different paraprofessional so as to help the student learn how to interact with a number of different adults. R. 3384.

Dr. Homan also testified that the phrase "constant adult supervision . . . across all school settings" describes a situation in which "there will be an adult designated to watch Lizzie, to work with Lizzie, to provide services to Lizzie in all school settings. . . . It's not a regular teacher. It's a special ed employee. It could be an EA [educational assistant]. It could be an occupational therapist. It could be a physical therapist[,] . . . a speech pathologist[,] . . . a special ed teacher[,] . . . [a]ny of our service providers." R. 3147–48. In essence these services were to be provided by different professionals at different times as opposed to a format where one specific adult was tasked with accompanying Lizzie at all times. R. 3121. I find that such an arrangement reasonably addresses safety concerns in relation to Lizzie's elopement and seizure activity as well as concerns that Lizzie would disengage in educational activities without an adult to redirect her.

The service delivery statement in the December IEP included a statement that "[s]ervices will include strategies and techniques consistent with those demonstrated at the Twain Training Lab including, but not limited to consistent reinforcement, first/ then strategies, visual prompts, and errorless teaching strategies." R. 1927. Ms. Olds testified that this sentence describes ABA methodology. Though the Lab and Alpine used different ABA strategies, she testified that the named strategies are those that she determined to be most effective with Lizzie at the Lab. R. 3267–71. For example, she described errorless teaching as a method of instruction by which the teacher guides a student to the correct response, often "hand-over-hand," when she selects the

incorrect response. R. 3267–68. Ms. Olds believed that this method led to more compliance behavior with Lizzie. R. 3270. She testified that "modeling" or asking Lizzie to repeat a demonstrated action was a less effective strategy. R. 3278. She also described the effects of "immediate reinforcement" on Lizzie and opined that Lizzie was more responsive to this strategy than the "delayed reinforcement" strategy used at Alpine. R. 3272. Thus, while the IEP does not specify "ABA methodology," it does describe techniques that are considered to be ABA approaches and have been shown to be effective with Lizzie at the Lab.

      2. <u>Lack of Functional Behavior Assessment and Behavioral Intervention Plan.</u>

Parents next argue that the IDEA requires an effective educational evaluation that identifies behavioral problems. ECF No. 33 at 16–17. They believe that a behavioral assessment and intervention plan are necessary to address Lizzie's negative behaviors of task avoidance, stimming, chinning and elopement. While I agree that IDEA regulations require schools to address behaviors that impede learning and development, the record does not reflect that Lizzie needs a functional behavioral assessment or behavior intervention plan in order to receive a FAPE.

The testimony of seven District witnesses who worked with Lizzie – Dr. Cornwall, Dr. Toplis, Ms. DeMatte, Ms. Potter, Ms. Cairns, Ms. Olds, and Mr. DeKam – all established that Lizzie's negative behaviors were not interfering with her ability to learn at school or to interact with other children. R. 1459, 2633, 3100–02, 3080–81, 3223, 2815–16, 3339, 3345–46. Two of Lizzie's teachers in District 11 who are both early childhood special educators with masters' degrees in early childhood education, Melanie DeMatte (2013–2014 school year) and Kathryn Potter (2014–2015 school year), testified that Lizzie did not need behavior intervention plans while in their classrooms. Neither teacher witnessed behaviors that they believed required an

intervention plan, and Ms. Potter observed that Lizzie's avoidance behaviors were easily redirected. R. 3081, 3223. Dael Cairns, Lizzie's occupational therapist with the District, noted task avoidance behaviors but did not observe the type of behaviors that she typically encountered with other students requiring behavioral intervention plans such as screaming, kicking, throwing or flopping onto the floor. R. 2815. Though she noticed Lizzie piling materials during unstructured time such as recess, she also observed those behaviors abate while Lizzie was engaged in educational activities. R. 2816. Ms. Olds testified that students for whom she typically recommended a behavior intervention plan were those that have engaged in self injury or physical aggression toward other staff or children. R. 3339. Ms. Olds testified that she did not observe any such behaviors with Lizzie. *Id.*

Though Ms. Olds did not believe that a formal intervention plan was necessary, she clarified that the Lab still intended to provide behavioral support to Lizzie at her neighborhood school. R. 3339. She explained that her team often creates a document to inform a teacher about a student's behaviors, how to arrange the environment to minimize the likelihood of those behaviors occurring, and what to do when those behaviors occur. R. 3339. Mr. DeKam had drafted such a "tip sheet" for Lizzie's teachers at Madison following her time in the Lab. R. 3346. While Ms. Krzemien did observe Lizzie engaging in self-injurious and noncompliant behavior while at Alpine, she also observed those behaviors decreasing over time. R. 2707–08. Accordingly, I find that the weight of the evidence indicates that further behavioral assessments or an intervention plan are not necessary to provide Lizzie a FAPE.

3. Extended School Year Services.

The Tenth Circuit has held that a child is entitled to ESY services where "the benefits accrued to the child during the regular school year will be significantly jeopardized if [she] is not

provided an educational program during the summer months. *Johnson v. Independent Sch. Dist. No. 4*, 921 F.2d 1022, 1028 (10th Cir. 1990). "The amount of regression suffered by a child during the summer months, considered together with the amount of time required to recoup those lost skills when school resumes in the fall, is an important consideration in assessing an individual child's need for continuation of his or her structured educational program in the summer months." *Id.* at 1027. In addition, courts should consider the severity of impairment, the child's behavioral and physical problems, and the availability of an educational structure at home or alternative resources among other factors. *Id.*

The ALJ concluded that Parents did not carry their burden in establishing that extended school year ("ESY") services were warranted as both sides "presented essentially conclusory testimony about the Student's propensity to regress." R. 1459. Dr. Homan testified that the data collected over Lizzie's first semester indicated some regression over breaks but also indicated quick recoupment after instruction started again. R. 3162. Ms. DeMatte and Ms. Potter testified that Lizzie did not need ESY because she did not show regression over breaks in their classrooms. R. 3076, 3224. Ms. Potter acknowledged that Lizzie was showing inconsistent progress but did not think that Lizzie was experiencing regression. R. 3224. Ms. Krzemien opined that Lizzie requires ESY services so as not to slow down in her progress. R. 2710–11. However, none of the witnesses offered a detailed factual basis for their conclusions.

Complicating this analysis is the fact that Lizzie missed her entire second quarter in the 2014–2015 school year when she was experiencing medical issues. There is some evidence of regression for the 2014–2015 school year reflected in the testimony of her teachers and Dr. Edmundson's Vineland assessments. R. 2505. The record does not indicate whether the same amount of regression could be expected during a regular school break absent those medical

19

problems. R. 1454. There was also no detailed evidence as to the amount of time necessary to recover skills expected to be lost during regular school breaks. R. 1454.

However, evidence of actual regression followed by a lack of recoupment is unnecessary to finding that ESY services are warranted. The District must consider predictive factors such as the severity of the student's impairment and circumstances of the "child's individual situation at home and in his or her neighborhood and community." *See Johnson,* 921 F.2d at 1028.

In declining ESY services, the District considered the fact that the Parents would continue to enroll Lizzie at Alpine during summer 2016. R. 1454. Parents argue that the only reason that there was not more significant regression over breaks was that they were providing Lizzie continuous services at Alpine at their own expense. Without these services, they argue, Lizzie would regress more significantly over breaks in the future. ECF No. 33 at 19. Accordingly, the District should not be able to satisfy its FAPE obligation by using resources provided by the Parents as a substitute for ESY services. *Id.* However, the Tenth Circuit has directed schools to consider the availability of alternative resources and the ability of the student's parents to provide an educational structure at home in determining whether ESY services are necessary. *See Johnson*, 921 F.2d at 1027–28. Based on Tenth Circuit law, the District appropriately considered the services that Parents provide Lizzie in determining that she would be unlikely to regress significantly during the school break. On this record, I find that the District did not err in withholding ESY services with the understanding that Lizzie's IEP should be reevaluated to include ESY services should regression and a delayed recovery of skills become likely given her circumstances – for example, should she again experience medical complications jeopardizing her progress.

**B.  Alpine as the Least Restrictive Educational Environment.**

20

A school district may also violate the IDEA by failing to provide a child with a FAPE in the least restrictive environment ("LRE"). This means that to the maximum extent appropriate, children with disabilities should be educated with children who are not disabled "and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); *see L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 975 (10th Cir. 2004). The ALJ found that "the December 2015 IEP represented a reasonable attempt to integrate Lizzie into the regular education setting with the benefit of flexibility, constant adult supervision, appropriate accommodations, and the proven ABA methodology" while her placement at Alpine with no interaction with non-disabled peers would have been overly restrictive. R. 1462. I agree.

Dr. Toplis testified that there is a body of evidence that demonstrates that in general, students with intellectual disabilities do better long term when they have exposure to their regular education peers. R. 3104–05. Based on her observations of Lizzie at the Lab and at Alpine she believes that Lizzie would benefit from interactions with neurotypical peers. R. 3105. Dr. Cornwall described Alpine and the continuum classroom at Madison as having the same level of inclusion – they both only include peers with identified learning or intellectual disabilities. R. 2656. However, she believed that Lizzie's opportunities for exposure to non-disabled peers in the general kindergarten classroom at Madison would benefit her, and that she would not have the opportunity for this exposure at Alpine. R. 2656.

District employees that worked with Lizzie also testified that they expect Lizzie to benefit from exposure to neurotypical peers. Ms. Olds testified that at the lab Lizzie enjoyed her

peers, and that neurotypical children could be expected to act as role models for Lizzie and to help her grow in socialization skills. R. 3283–84. Ms. DeMatte testified that in her classroom Lizzie enjoyed interacting with typical peers – although she was "shy at first," she would smile and play with them "in slow increments." R. 3082. In Ms. DeMatte's opinion, Lizzie benefited from these interactions. R. 2083. Jane Kranich, who served Lizzie in her preschool class as the District's speech and language pathologist, testified that Lizzie would follow her peers, model her peers, and enjoy music and songs with her peers in the general education classroom resulting in a "big improvement" with her compliance behaviors. R. 2845–46. Ms. Potter also observed Lizzie interacting with typical peers by allowing peers to hold her hand and guide her or by interrupting the play of other children for attention. She did not believe that Lizzie engaged in disruptive behavior in her classroom and enjoyed having her as a student. R. 3228–29.

On the other hand, Ms. B. testified that socially, Lizzie will not interact with neurotypical peers. R. 2595. Mr. B. also testified that when he observed Lizzie in the classroom setting she did not engage with other children. R. 2912. Ms. Ruvulcaba, the clinical director at Alpine, testified that currently, Lizzie does not have the foundational skills or knowledge to be able to benefit from being in a classroom with typical peers. R. 2687. She believed that putting Lizzie in an environment with typical peers would isolate her as she would not know how to interact and would become frustrated. R. 2676. However, Lizzie was not exposed to non-disabled peers at Alpine. Given the observations of District staff regarding interactions with neurotypical peers and Dr. Toplis's opinions, I find that the weight of the evidence supports a conclusion that Lizzie can benefit from exposure to non-disabled peers. Her IEP offers her these opportunities with appropriate support. In providing an environment with no interaction with non-disabled peers, the proposed alternative placement at Alpine would be overly restrictive and not preferred under

20 U.S.C. § 1412(a)(5).

## C. Predetermination of Lizzie's Placement at Madison

The IDEA contains procedures to ensure that a student's parents can be significantly involved in educational decisions concerning their child. *Murray v. Montrose County Sch. Dist. RE-1J*, 51 F.3d 921, 925 (10th Cir. 1995). Parents argue that in violation of these procedural safeguards, the District "never seriously gave consideration to any other educational placement than a regular public school classroom at Madison Elementary, despite Lizzie's enrollment and success at Alpine since March 2015, and the Parents' objections to a regular education placement." ECF No. 33 at 23. Because the settlement agreement waived claims based on events prior to July 2015, the focus of this analysis is on the August 2015 and December 2015 IEP meetings. I find that the record demonstrates that the IEP team solicited Parent's opinions in good faith, and that Parents meaningfully participated in the IEP process even though the parties ultimately disagreed on Lizzie's placement at Madison.

The IEP team meetings lasted over four hours each, though the District's typical IEP meetings last for an hour and a half to two hours. R. 3132–33. Dr. Homan testified that the meetings lasted so long because of the number of reports the team had to review, and because District staff made a conscious effort to solicit parental input and respond throughout the meeting. R. 3133. The August 2015 meeting took place after the settlement agreement which resulted in Lizzie's placement at the Lab for the fall quarter. The purpose of the meeting was to discuss this agreed placement and consider and update evaluations that the district had conducted. R. 3123. Dr. Homan testified that the Parents, their advocate and a representative from Alpine attended, and that she actively solicited their input after each evaluation and section in the IEP. R. 3123. Parents wished to enroll Lizzie at Alpine for half days, and although it was

unusual for the Lab, the IEP team agreed to enroll Lizzie in the Lab during the afternoon to accommodate her time at Alpine in the mornings. R. 3128–29.

Parents, their advocate and two representatives from Alpine attended the December 2015 meeting along with District staff. R. 3134. Dr. Edmundson participated by telephone. R. 3135. The parties also considered the report of Dr. Toplis, prepared at the Parents' request. R. 3137. The IEP contains notes of Parents' proposals, the discussions that followed, and how the team reviewed evaluation and progress data. R. 1209–15. It contains the note that the IEP team "considered parent input about placement at the Alpine Autism Center" but rejected this option, because "the team feels that she needs to interact with typical peers." R. 1215.

The record also reflects that on certain points, with the benefit of the Parents' input, the District adjusted accommodations. For example, Ms. Old testified about how the Parents expressed concerns about the assistive technology that Lizzie was being provided in the classroom and how the District obtained technology that mirrored the functionality of devices that Lizzie had begun using at home in light of their continuing discussions with Parents. R. 3274–77. At the same time, Mr. B. was frustrated that the District would not permit Lizzie to bring home the device she was using at school, and that Parents had to provide certain technologies to the District. R. 2926. He also felt that at the December 2015 IEP meeting, the District staff ignored his concerns that Elizabeth needed more occupational therapy, physical therapy and speech/ language services, only because he didn't have data to support such requests. Though he had these frustrations, he did tell the District that the December 2015 IEP meeting was one of the most productive ones to date. R. 2972–72. He testified that he felt that the District listened to his concerns. R. 2972. In sum, though the parties disagree about the appropriateness of Lizzie's IEP, Parents do not establish that the District predetermined her

placement prior to the IEP meetings.

## D. Reimbursement for the Costs of Alpine

The IDEA permits parents who believe that their child is not receiving a FAPE at a public school to enroll her at a private school and then request reimbursement from the school district for the private school enrollment. 20 U.S.C. § 1412(a)(10)(C)(ii). Parents who unilaterally enroll their child in a private school "do so at their own financial risk." *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993). If a school district denies the parents' request for reimbursement, a federal court may order reimbursement only if the court concludes both "[1] that the public placement violated IDEA and [2] that the private school placement was proper under the [IDEA]." *Id.* Because plaintiffs do not carry their burden to show that the District violated the IDEA, I need not determine whether placement at Alpine was appropriate. Accordingly, Parents are not entitled to reimbursement of the costs they incurred for private placement at Alpine.

## ORDER

The decision of the ALJ is AFFIRMED. Judgment shall enter in favor of the District and against Plaintiffs on their complaint.

DATED this day 12th day of August, 2019.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge